

**NUMBER 13-05-457-CR**

**COURT OF APPEALS**

**THIRTEENTH DISTRICT OF TEXAS**

**CORPUS CHRISTI - EDINBURG**

---

**JEANINE HANNAH,** **Appellant,**

**v.**

**THE STATE OF TEXAS,** **Appellee.**

---

**On appeal from the 93rd District Court of Hidalgo County, Texas.**

---

# MEMORANDUM OPINION

**Before Justices Yañez, Rodriguez, and Benavides**
**Memorandum Opinion by Justice Benavides**

Margaret Bradley died from an insulin overdose on May 30, 2002. At age sixty-eight, while Bradley suffered from several maladies—she was confined to a wheelchair due to partial paralysis and suffered from multiple sclerosis—she was not diabetic. The State of Texas charged appellant, Jeanine Hannah, with causing Bradley's death by injecting her with a massive amount of insulin. *See* TEX. PENAL CODE ANN. § 19.02(b) (Vernon 2003). A jury convicted Hannah, and the trial court assessed a ninety-nine year sentence. *Id.* §

12.32(a) (Vernon 2003). Hannah now appeals, arguing that (1) the trial court abused its discretion by allowing the State to present evidence of extraneous bad acts to which Hannah was linked; (2) the evidence supporting her conviction is legally insufficient; and (3) the evidence supporting her conviction is factually insufficient. We affirm.

## I. Background

Hannah's trial took place between May 16th and May 27th in 2005. Over the course of eight days and approximately twenty witnesses, the following narrative emerged.

### A. Bradley's Death

In early 2002, Bradley was living in McAllen, Texas, with her daughter, Rhonda, and Rhonda's common-law husband, Michael Neiger. Because of her infirmities, Bradley needed domestic assistance. Rhonda hired Kelly Health Care, Inc. ("Kelly Health") to provide a caretaker. In February of 2002, Kelly Health sent a registered nurse, Jeanine Hannah, to assist Bradley. Hannah visited Bradley twice a day, once in the morning and once in the afternoon, to help Bradley with routine tasks such as feeding and bathing. Medicare covered the morning visits, and Bradley paid Hannah for the afternoon visits via personal check.

Although Bradley needed Hannah's help with some things, she did not need help taking her medication. Bradley took medication for her many ailments, but she took them on her own. The medicines hung from a bag on the handle of Bradley's scooter where she could access them easily. Insulin was not among her medicines. In fact, none of her medicines were taken by injection as insulin is generally taken.

Bradley did, however, like to receive occasional injections of vitamin B-12. Because she trusted Hannah's credentials as a registered nurse, she asked Hannah to inject her.

2

The B-12 syringes, which Bradley stored under the bathroom sink, were much larger than ordinary insulin syringes. Bradley's daughter, Rhonda, was a registered nurse, and she testified that the syringes could hold approximately three times the insulin dosage for a normal diabetic person.

On May 29, 2002, Michael returned home from work at about 5:40 p.m. and found Bradley non-responsive, mumbling, and "look[ing] real clammy and dazed." He also noticed that her mobility was restricted because she was struggling to grasp a cup that she ordinarily grasped easily. Michael called Rhonda at work to alert her, reasoning that because Rhonda was a nurse at McAllen Heart Hospital, she "had more knowledge" about such things.

According to Rhonda's testimony and cell phone records, she had already spoken to her mother over the phone at 3:35 p.m. that day and to Hannah at 3:36 p.m. Hospital employment records and a store receipt show that Rhonda clocked out of work at 3:23 p.m. that afternoon and made a purchase at the J.C. Penney store at La Plaza Mall in south McAllen. She returned to work at 4:20 p.m., and she received the phone call from Michael about Bradley's condition at 5:43 p.m.

Rhonda rushed home and sat with her mother for about forty minutes. She grew concerned about Bradley's deteriorating condition and called an ambulance at 6:26 p.m. The ambulance crew conducted blood tests and determined that Bradley was suffering from unusually low blood-sugar levels. At the hospital, her blood-sugar levels fluctuated for the next twenty-four hours, and doctors could not determine the cause of the instability. She died the following evening.[1]

---

[1] The doctors first listed secondary adrenal insufficiency as the cause of death. As we explain, however, the cause of death was later changed to an exogenous insulin overdose. *See infra* Part I, C.

**B. Bradley's Checks**

At the time of her death, Bradley had accounts at two banks, Wells Fargo and Texas State Bank. When Rhonda went to the banks to see how much money Bradley had for funeral expenses, she noticed discrepancies between the ledgers in Bradley's check book and the bank's records. This prompted her to investigate recent activity in both accounts, and she uncovered some unusual transactions.

First, Bradley's ledger listed check #5038 as having been written for $566 for groceries, but according to the bank, the check had actually been written to AIG Insurance. Rhonda discovered that the check paid for an auto insurance policy for William and Aloha Shuell of Mission, Texas. Hannah was a covered driver on the policy.

Second, Rhonda found check #5051 in her mother's paper shredder. When she taped it back together, she noticed that it was a voided check for $160 written to Hannah and stamped with Bradley's signature stamp.[2] Rhonda later discovered that the $160 check had been voided when Hannah tried to cash it.

Two employees of Coastal Bank, Yadira Reyna, a teller who received the check, and Sandra Vecchio, her supervisor, testified that Hannah had come through the drive-through in May 2002 seeking to cash what appeared to be an altered check written on Bradley's Wells Fargo account. Originally, the check had been written for $60, but the number "1" had been added in a different colored ink, altering the check to read "$160." On the instruction of Vecchio, Reyna voided it. Reyna recalled Hannah becoming very upset about the bank's refusal to cash the check and insisting that it was Bradley who had altered the number.

---

[2] Bradley had two such stamps which she normally kept in her medicine bag. Rhonda testified that one of them was missing.

Third, check #5029 had been listed in Bradley's ledger as written to Rhonda's sister, Paula Tveit. Tveit testified that her mother often sent her checks of between $50 and $100. She stated that Bradley recently promised to send a check, but she never received it. Rhonda discovered that check #5029 was actually cashed by Hannah for $1,300, and Hannah's name is written over Tveit's name on the check. Tveit further testified that her mother would not have sent her $1,300, and a $300 check was far more likely. The $1,300 check and two other checks—a $21.59 refund from Southwestern Bell and a $412.82 annuity from Allstate—were all deposited in Hannah's bank account on May 31, 2002, the day after Bradley's death.

A Texas State Bank teller, Anita Munoz, testified at trial that she knew Hannah to be a regular bank customer and that she noticed on May 31, 2002 that a $1,300 check Hannah sought to cash had been altered. Munoz was reluctant to cash the check, but she said Hannah insisted that she at least deposit it, and "charge it to her [Hannahs's] account" if any problems arose. Munoz testified that her superiors at the bank were "furious" about the incident and that she nearly lost her job over it.

Finally, Rhonda was perplexed to see that a balance of only $200 remained in her mother's Texas State Bank account due to six recent ATM withdrawals ranging from $200 to $300. According to Rhonda, this was odd because Bradley did not have the ability to use an ATM herself. Moreover, she had traditionally only wanted about $50 in cash per month, which she used to play bingo. All of these dubious transactions caused Rhonda to remember that approximately one month before her death, Bradley had complained that Hannah asked too many financial questions and wanted to write checks on Bradley's behalf.

5

## C. Bradley's Insulin Levels

Rhonda testified that her suspicions were overwhelming at this point. She asked Luis Padula, M.D., to examine lab results from a c-peptide test given to Bradley during her stay at the hospital, the results of which were not received until after Bradley's funeral.[3] Dr. Padula told her that the test indicated that Bradley, at the time of her death, had a massive excess of insulin in her body. Furthermore, the c-peptide test conclusively ruled out both pancreatic cancer and endogenous hyperinsulinsim. Dr. Padula further told Rhonda, and later testified in court, that although he could not determine how much or what type of insulin had been injected, it was clear that the amount was vastly greater than would be necessary to treat any patient, even a diabetic.

These opinions were echoed by Mercy Bayot-Moore, M.D., an endocrinologist who examined Bradley's insulin levels before her death and observed that Bradley had an insulin reading of 400, well above the normal reading of around 27. The attending doctors then filed an amended death certificate, listing Bradley's cause of death as an exogenous insulin overdose.

Rhonda notified the police about these developments on June 6th, but by then, Bradley's funeral had already taken place, and she had been cremated. In 2004, two-and-a-half years after Bradley's death, Hannah was arrested and indicted for knowingly and intentionally causing death and serious bodily injury to Bradley.

## D. Hannah's History

At Hannah's trial, testimony revealed that before she arrived in McAllen to work for Kelly Health, Hannah had an unusual employment history, characterized by changing jobs

---

[3] A c-peptide test reveals how much naturally-produced insulin should be in the body. *See* Web-MD, *Diabetes Health Center*, *available at* http://diabetes.webmd.com/c-peptide (Last Visited Aug. 5, 2008).

frequently, using aliases (she has been known at different times as Jeanine Hannah, Jeannie Miata, and Julie Kocian), and being connected to a suspicious—possibly criminal—incident in Oregon. We discuss this history herein, because Hannah objected to the following testimony under Texas Rules of Evidence 104, 404(b), and 403 and because the evidentiary relevance of the history is the principal issue on appeal.

First, Troya Brown, an Oregon resident, testified that Hannah worked with her at a rehabilitation facility in Beaverton, Oregon, in 2001. At that time, according to Brown, Hannah was known as Jeannie Miata. Brown testified about an incident that occurred on September 10, 2000. On that day, she came to work at 6:30 a.m. and encountered Hannah completing her night shift and monitoring an elderly patient named Anne Jones. Hannah asked Brown, in an unusually adamant fashion, not to walk into Jones's room to check on her because the patient had "had a rough night." Brown found her co-worker's insistence to be odd, and she ignored the request. Hannah followed Brown into the patient's room and began insisting that Brown verify the insulin amount which she had administered to Jones. Brown testified that she found this to be odd behavior also.

Janice Nezbeda, the nursing director at the Beaverton facility, who also knew Hannah as Jeannie Miata at the time, arrived that day at 9:00 a.m. She found Jones unconscious in her room and with a very low blood-sugar level of 13. She testified that a normal reading would have been between 60 and 80. Moreover, just two hours beforehand, Jones's blood-sugar levels had been at 100. Jones died later that day.

Jones appeared to have signed a "do not resuscitate" form ("DNR"), but James Green, an expert in forensic document examination, testified that he did not believe that Jones's DNR had actually been signed by Jones. In fact, he completely excluded the

7

possibility. Green also examined Hannah's handwriting, and he applied a system in which the likelihood of forgery is assigned a number on a one-to-nine scale, with nine being the most likely. On this scale, Green testified that the likelihood that Hannah had forged Jones's signature on the DNR was a seven.

Jones's daughter, Marjorie Wooliver, testified that after Jones's death, a diamond ring was missing from her finger. Nurses and others who had attended to Jones remembered the ring, but they did not know what happened to it. Wooliver doubted that the ring would simply have slipped off because Jones's fingers had become swollen with illness, making the ring very difficult to remove. Nezbeda announced that she would be launching an investigation into the loss of the ring, but two days later—before the police were notified—the ring appeared in Nezbeda's office mailbox. It was placed in an envelope and left anonymously. No charges were filed over the brief disappearance of the ring.

After this incident, Hannah moved to Texas and took a job in the city of Mission under the name "Julie Kocian." At trial, Minerva Ruiz, the director of Mission Hospital, identified Hannah as the registered nurse who worked at the hospital under that name from June to September of 2001.

Ruiz gave specific testimony about the particulars of insulin. She testified that it can remain effective for several months, and it does not have an expiration date of just a matter of days, "like milk." Ruiz testified that Hannah was knowledgeable about these particulars and had access to the hospital's insulin cache. Hannah worked in an area of the hospital where over seventy percent of the patients were in need of regular insulin injections. Mission Hospital, Ruiz explained, kept its insulin stored in a locked refrigerator to which

8

Hannah and all the other nurses had a key. According to Ruiz, there is no accounting system for the insulin, and if some of it were missing or stolen, it would be difficult to detect.

Ruiz testified that Hannah left the hospital due to a work-related injury. It was after leaving Mission Hospital that Hannah joined Kelly Health and began working with Bradley.

### E.     Hannah's Defense Strategies

Hannah appears to have had two defensive strategies at trial. First, she questioned whether an insulin overdose was the true cause of Bradley's death. Second, she sought to raise reasonable doubt by suggesting that Bradley's daughter, Rhonda, had the opportunity and the motive to kill Bradley by injecting her with exogenous insulin. For example, during Rhonda's cross-examination, Hannah's defense counsel led Rhonda to testify that, as a nurse, she had regular access to insulin and, in fact, she had once brought insulin home from the hospital:

Q:     At your place of employment you have access—as a registered nurse you have access to insulin?

A:     Yes, sir.

Q:     And, in fact, do you recall back on June 30th, 2002 when you spoke to Detective Ralph Ramirez—

A:     Yes, sir.

Q:     —that approximately five years ago you had accidentally taken some insulin home? Do you recall that?

A:     Yes, sir.

. . . .

A:     I returned the medication to the hospital, and I threw it in the trash—

Q:     Okay.

9

A:      —because it had been out of the refrigerator for so long.

Q:      Okay.  Do you have a recollection as to why you would have had that insulin, again back five years ago, and mistakenly taken it home?

A:      I had administered it to a patient and put it in my pocket in a hurry and just never checked my pockets before I left home.

After this questioning, Hannah's counsel asked Rhonda why, during her direct examination, she felt the need to offer time records from McAllen Heart Hospital and a J.C. Penney receipt to prove her whereabouts on the apparent afternoon of Bradley's overdose. Rhonda replied that after speaking with the detective who was investigating the death, it became a "concern" of hers to provide evidence of her whereabouts.  Finally, Hannah's defense counsel forced Rhonda to disclose that she was a "compulsive gambler" and that, in the past, Bradley had helped Rhonda pay off gambling debts.  Rhonda also testified that Bradley had borrowed $10,000 on a credit card to help Rhonda purchase a car.

At the conclusion of the trial, Hannah was found guilty of killing Bradley and sentenced to ninety-nine years in prison.  She now appeals.

## II. Standards of Review

The first issue in this case, comprised of three sub-issues, concerns the trial court's ruling on the admissibility of evidence; such issues are reviewed for abuse of discretion. *Sauceda v. State,* 129 S.W.3d 116, 120 (Tex. Crim. App. 2004).  "The trial court abuses its discretion when the decision lies outside the zone of reasonable disagreement." *McCarty v. State,* No. PD-1139-07, 2008 WL 2512818, at *1 (Tex. Crim. App. June 25, 2008) (citing *Cantu v. State*, 842 S.W.2d 667, 682 (Tex. Crim. App.1992)).

The two remaining issues concern sufficiency of the evidence.  To assess whether the evidence supporting a verdict is legally sufficient, we consider all the evidence in the

record in the light most favorable to the jury verdict and determine whether a rational jury could have found the defendant guilty of all the elements of the crime beyond a reasonable doubt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)); *Swearingen v. State*, 101 S.W.3d 89, 95 (Tex. Crim. App. 2003). "In reviewing the sufficiency of the evidence, we should look at 'events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act.'" *Hooper*, 214 S.W.3d at 13 (quoting *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App.1985)). While each fact may not point directly and independently to the appellant's guilt, we may affirm "as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Id.* Circumstantial evidence alone may be enough to establish guilt. *Id.*

To assess whether the evidence behind a verdict is factually sufficient, we review the evidence in a neutral light to determine whether (1) the evidence is so weak as to render the jury verdict clearly wrong and manifestly unjust or (2) whether the evidence supporting the verdict is so outweighed by the great weight and preponderance of the contrary evidence as to render the verdict clearly wrong and manifestly unjust. *Grotti v. State*, No. PD-134-07, 2008 Tex. Crim. App. LEXIS 761, at *22-23 (Tex. Crim. App. June 25, 2008). We must show great deference to a jury verdict. *Watson v. State*, 204 S.W.3d 404, 417 (Tex. Crim. App. 2006). "An appellate court judge cannot conclude that a conviction is 'clearly wrong' or 'manifestly unjust' simply because, on the quantum of evidence admitted, he would have voted to acquit had he been on the jury. Nor can an appellate court judge declare that a conflict in the evidence justifies a new trial simply

11

because he disagrees with the jury's resolution of that conflict." *Id.* at 417.

### III. Admissibility of Extraneous Offense Evidence

It is a fundamental principle of law in all English-speaking jurisdictions that defendants must only be tried for the crimes for which they have been charged, not other disconnected crimes. *Turner v. State*, 754 S.W.2d 668, 671 (Tex. Crim. App. 1988) (citing *Young v. State*, 261 S.W2d 836, 837 (Tex. Crim. App. 1953)). Therefore, to avoid undue prejudice to defendants, the circumstances under which we permit evidence of extraneous offenses at trial are limited. *See* Tex. R. Evid. 404(b) (listing justifications for permitting extraneous offense evidence); *see also Tamez v. State*, 48 S.W.3d 295, 296 (Tex. App.–San Antonio 2001, no pet.) (holding that prohibition on use of extraneous offense evidence is a "basic tenet of our criminal justice system") (quoting *Smith v. State*, 12 S.W.3d 149, 152 (Tex. App.–El Paso 2000, pet. ref'd)).

Hannah argues that the jury heard evidence of two prior offenses for which she was not charged or convicted: (1) theft of insulin from Mission Hospital; and (2) Jones's death by insulin overdose and the apparent theft of her ring in Oregon. She argues that the admission of this evidence violated Texas Rules of Evidence 104, 404(b), and 403. Tex. R. Evid. 104, 404(b), 403. We must assess whether the trial court abused its discretion in admitting this evidence. To do this, we need to determine whether (1) the State proved that Hannah's involvement in the extraneous offenses was probable beyond a reasonable doubt, *id.* at R. 104; (2) the evidence was properly admitted under an exception to the general prohibition against evidence of extraneous bad acts, *id.* at R. 404(b); and (3) the probative value of the evidence outweighed the unfair prejudice to Hannah. *Id.* at R. 403.

**A.     Texas Rule of Evidence 104(b)**

For evidence of Hannah's extraneous offenses to be permitted at trial, the State was required to demonstrate beyond a reasonable doubt that Hannah had committed the offenses. *See id.* at R. 104(b) ("When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition."); *Ex parte Varelas*, 45 S.W.3d 627, 630-31 (Tex. Crim. App. 2001). In this case, the State met this requirement.

1. **A Reasonable Jury could have Determined Beyond a Reasonable Doubt that Hannah had Knowledge of and Access to Insulin at Mission Hospital.**

Hannah argues that the trial court erred in admitting evidence that she stole insulin from Mission Hospital because there was no evidence that she administered insulin to patients there or that insulin had ever been missing from the hospital. We disagree.

It is true that no direct evidence was presented that Hannah had stolen insulin from Mission Hospital, but the issue in this case is whether a reasonable jury could have found that she had knowledge of insulin and access to it within a reasonable time before Bradley's death. The evidence on this point is stark. Hannah had a key to a locked medication room. Ruiz testified that Hannah had "working knowledge" of insulin and its effects. Hannah worked in an area where over seventy percent of the patients were in need of regular insulin injections. A jury could have found beyond a reasonable doubt that she had access to insulin and knowledge of its use.

2. **A Reasonable Jury could have Determined that Hannah was Culpable in Jones's Death and the Theft of her Ring**

The evidence presented of Hannah's link to Jones's death and the theft of her ring—testimony by five witnesses—was substantial. To begin, two witnesses, Brown and

13

Nezbeda, from Beaverton Rehabilitation in Oregon testified that Hannah was the woman with whom they once worked and who they knew as Jeannie Miata. Their testimony revealed that Hannah behaved in an awkward and suspicious manner on the morning of September 10th, when she urged Brown to stay away from Jones. Brown also testified that she found it odd that Hannah would request verification of the insulin dosage she had administered to Jones, but not verification for her other patients. In fact, Brown testified that it was odd that Hannah would even be present in the rehabilitation facility, given that her shift had already ended. Brown and Nezbeda both explained that later that day, and soon after exhibiting an extremely low blood-sugar level, Jones died from an insulin overdose.

Jones's DNR had been signed, but Green, a forensic document examiner, testified that he did not believe that Jones's signature was on the document. He further testified that, after he reviewed Hannah's handwriting, he believed it was "probable" that the signature was Hannah's. He assigned the precise probability that Hannah had forged Jones's signature as a "seven" on a one-to-nine scale (one being least likely, and nine being most likely).

Finally, evidence was presented that a diamond ring disappeared from Jones's hand and was later anonymously returned only after the facility director threatened to refer the incident to the police. After the incident, Hannah left Oregon and changed her name.

We believe this evidence, cumulatively, could have led a reasonable jury to conclude beyond a reasonable doubt that Hannah was culpable in this incident. A jury could infer that Hannah most likely killed Jones by injecting her with an overdose of insulin and then expedited her plan by forging Jones's signature on the DNR and urging other

14

nurses to stay away. *See Hooper*, 214 S.W.3d at 13 (permitting inferences by juries as long as each inference is supported by the evidence at trial). A reasonable jury could have further inferred that Hannah stole the diamond ring but became worried when Nezbeda announced an investigation and furtively replaced the ring. *Id.*

## B.     Rule 404(b)

Although the extraneous offense evidence against Hannah met the requirements of rule 104(b), it must also meet the requirements of rule 404(b) or it must rebut a defensive theory in order to be admissible. *See* TEX. R. EVID. 404(b) (extraneous offense evidence must demonstrate proof of "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident" rather than merely going towards the defendant's character); *Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007) ("Extraneous-offense evidence is not inadmissible under Rule 404(b) when it is offered to rebut an affirmative defense or a defensive issue that negates one of the elements of the crime."). We believe that both the extraneous offenses in this case meet these requirements. The evidence of Hannah's theft of insulin from Mission Hospital is admissible as rebuttal evidence; the evidence of her involvement in the Oregon incident is admissible for proving modus operandi.

## 1.     Evidence of Hannah's Possible Theft of Insulin from Mission Hospital

The evidence of Hannah's knowledge of and access to insulin at Mission Hospital, suggesting a possible theft, was admissible in this trial because it was used to rebut a key defensive theory proffered by Hannah. *See Casey*, 215 S.W.3d at 879; *Powell v. State*, 63 S.W.3d 435, 438-40 (Tex. Crim. App. 2001) (holding that the State is entitled to rebut defensive theories raised by the defense in the opening statement).

15

In his opening statement, Hannah's counsel explained to the jury that one of his defensive strategies in the trial would be to deny that Hannah was the source of the exogenous insulin that killed Bradley. In fact, he told the jury that the evidence in the trial would demonstrate that Hannah did not even have access to insulin:

> First, [the evidence] will not establish that Jeanine Hannah, the Defendant, was the source of the insulin overdose. There is not going to be any evidence about that. Number two, there is not going to be any evidence that Jeanine Hannah had access either at work or at her place of work or at the hospital of access [sic] or possession of insulin.

In order to rebut this argument, the State was permitted to show that Hannah had access to insulin during her employment as a nurse at Mission Hospital. *See Casey*, 215 S.W.3d at 879; *Powell*, 63 S.W.3d at 438-40. Hannah asserts that this is an insufficient justification because she was not working at Mission Hospital at the time of Bradley's death, and thus, she did not have access to insulin at the relevant time. This argument, however, is countered by Ruiz's testimony that insulin can remain effective for several months, and it does not have an expiration date of just a matter of days.

Thus, according to testimony adduced at trial, Hannah had access to useable insulin within a reasonable time frame before Bradley's death, and the State presented this evidence in direct response to a defensive theory proffered by Hannah's counsel. It was not, therefore, an abuse of discretion to allow it into evidence.

## 2. Evidence of Hannah's Culpability for Jones's Death and the Ring

We also believe the evidence of the incident in Oregon was properly introduced because it demonstrated modus operandi, which refers to "a defendant's distinctive and idiosyncratic manner of committing criminal acts." *Casey*, 215 S.W.3d at 880-81 (quoting *Owens v. State*, 827 S.W.2d 911, 915 (Tex. Crim. App. 1992)). "Evidence of a defendant's

16

particular modus operandi is a recognized exception to the general rule precluding extraneous offense evidence, if the modus operandi evidence tends to prove a material fact at issue, other than propensity." *Owens*, 827 S.W.2d at 915. We do not recognize the modus operandi exception here merely because multiple murders are involved; the State must show not only repeated crimes, but "particularized details or unique qualities of the two acts." *Martin v. State*, 173 S.W.3d 463, 467-68 (Tex. Crim App. 2005); *Owens*, 827 S.W.2d at 915.

The modus operandi exception is also important because it can implicate the "doctrine of chances," which holds that evidence of the repetition of similar unusual events over time demonstrates a decreasing probability that the events occurred merely by chance. *Daggett v. State*, 187 S.W3d 444, 453 n.18 (Tex. Crim. App. 2005); *Martin*, 173 S.W.3d at 467; *Plante v. State*, 692 S.W2d 487, 491-92 (Tex. Crim. App. 1985). The doctrine reflects the principle that evidence of striking similarities between two rather idiosyncratic crimes is evidence that the same perpetrator was behind both crimes, and such evidence is admissible under 404(b) for its probative value—not merely to unfairly attempt to try the defendant for an extraneous offense. *See* TEX. R. EVID. 404(b).

Here, the trial court specifically commented on the insulin overdose deaths in Oregon and Texas being a "distinctive and idiosyncratic manner of committing criminal acts." We agree. Exogenous insulin, unlike firearms or knives, is not commonly used as a murder weapon.

Moreover, Hannah's defensive theory appears to have been to implicate Rhonda, Bradley's daughter, in the administration of the excess insulin. The defense spent much of its cross-examination of Rhonda focusing on the fact that she was a registered nurse

who had taken insulin home from the hospital before and that she was a compulsive gambler who relied upon Bradley to help pay her gambling debts. The State offered the evidence of Jones's death in Oregon in order to show that even if both Rhonda and Hannah had equal access to insulin, only Hannah could be connected to a modus operandi. This particular modus operandi was to murder elderly patients via insulin overdose and steal from them. The trial court explained this reasoning in clear terms, and we cannot say that its decision to allow the evidence was an abuse of discretion.

## C. Texas Rule of Evidence 403

Finally, we do not believe the trial court abused its discretion by determining that the probative value of the extraneous offense evidence substantially outweighed the danger of unfair prejudice to Hannah. *See id.* at R. 403. "Unfair prejudice" does not arise from the mere fact that evidence injures a party's case, because virtually all evidence that a party offers will be prejudicial to the opponent's case. *Casey*, 215 S.W.3d at 883. Evidence is "unfairly prejudicial" when it tends to have some adverse effect on a defendant beyond tending to prove the fact or issue that justifies its admission. *Id.*

> [A] trial court, when undertaking a Rule 403 analysis, must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Gigliobianco v. State,* 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006). The factors in this balancing test frequently blend together in practice. *Id.*

18

Applying these factors, we first note that the inherent probative force of both extraneous offenses was significant because it tended to prove Hannah's opportunity to access insulin and her possible modus operandi, which Hannah disputed vehemently. *Casey*, 215 S.W.3d at 882 (extraneous offense evidence probative to dispute central issue at trial as raised by defense). Second, the State's need for the evidence was significant because it was the only evidence available to the State to rebut the defensive theory that Bradley's daughter Rhonda was a more plausible source of the insulin than Hannah. *Id.* at 883-84 (probative force of evidence centered in State's inherent inability to rebut defensive arguments).

The evidence is certainly prejudicial, but we cannot say that such prejudice was unfair. There is no indication in the record that the jury was unequipped to evaluate the probative force of the evidence. Because the evidence was significant, but not repetitious, it did not consume an inordinate amount of time. There is nothing in the record to show that the evidence confused the jury or suggested a decision based on an improper basis (i.e., a verdict based on the extraneous offenses rather than the instant offense).

The trial court is presumed to have applied the same analysis in deciding to allow the evidence against Hannah. *See Williams v. State*, 958 S.W.2d 186, 195 (Tex. Crim. App. 1997) (holding that the balancing test is presumed to have been conducted if the trial record is silent on the test). We give great deference to the trial court's conduct of the test, and we do not believe it was an abuse of discretion to determine that the probative value of the evidence outweighed its prejudicial nature.

## IV. Legal Sufficiency

Hannah next argues that even if the trial court did not abuse its discretion in

admitting the extraneous offense evidence, the cumulative evidence is nevertheless legally insufficient to support a guilty verdict because there is no direct evidence of her guilt. We disagree with Hannah's framing of the legal sufficiency issue, and we further believe that the evidence in the record—considered in the light most favorable to the verdict—is legally sufficient to support a guilty verdict because it could have led a rational jury to find Hannah guilty of all the elements of murder beyond a reasonable doubt. *See Swearingen*, 101 S.W.3d at 95.

The Texas Court of Criminal Appeals recently clarified the test for legal sufficiency. *See Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Even absent direct evidence, the court explained that juries are "permitted to draw multiple reasonable inferences as long as each inference is supported by the evidence presented at trial." *Id.* at 15. Therefore, contrary to Hannah's argument, circumstantial evidence alone can be sufficient to establish guilt. *Id.*

In this case, we believe the cumulative evidence—even if it is primarily circumstantial—is overwhelmingly against Hannah because the inferences which the jury was required to draw about her motive and opportunity were reasonably supported by the facts adduced at trial. For example, a jury could have made a reasonable inference about Hannah's motive to murder Bradley. In its closing argument, the State told the jury that its theory of motive in this case was "that Jeanine Hannah was stealing from Margaret Bradley. And then she wanted to cover up these thefts because [she] was about . . . to get caught." The State supported this theory of motive with extensive facts about strange transactions in Bradley's bank accounts: (1) a check which Bradley's ledger had marked as "groceries," but which in reality, had paid for an insurance policy for Hannah; (2) a

shredded check Coastal Bank voided because it appeared fraudulent; (3) a check, originally thought by a bank teller to be fraudulent, written in Hannah's ledger to Bradley's daughter Tveit for an unusually large amount—but which was actually cashed by Hannah; (4) refund and annuity checks to Bradley deposited in Hannah's account the day of Bradley's death; and (5) frequent ATM withdrawals from Bradley's account for amounts far larger than she had ordinarily withdrawn. Finally, the State presented evidence that Bradley had begun to grow suspicious about Hannah's questions about her finances. A reasonable jury could have heard this evidence and inferred that Hannah was systematically stealing from Bradley, feared being caught, and had the motive to kill her.

A reasonable jury could also have found beyond a reasonable doubt that Hannah had the opportunity to kill Bradley, given that (1) she had working knowledge of insulin from her training as a nurse and her prior access to it at Mission Hospital; (2) she was entrusted to administer injections to Bradley; (3) she was the last person known to be with Bradley before the onset of her condition; and, most strikingly, (4) Hannah's link to a remarkably similar incident in Oregon.

In short, the State presented a full narrative which, in its cumulative effect, made a legally sufficient case that Hannah killed Bradley. Because a jury could have made reasonable inferences based on the evidence presented to reach this conclusion, we may not overturn the jury's verdict. *See Hooper*, 214 S.W.3d at 13. We overrule Hannah's second issue.

## V. Factual Sufficiency

Hannah's final argument on appeal is that the evidence presented at trial is factually insufficient to support the guilty verdict. Evaluating the evidence in a neutral light, favoring

21

neither party, we cannot say that the guilty verdict is clearly wrong and manifestly unjust, or that the evidence in support of the judgment is outweighed by the great weight and preponderance of the contrary evidence. *See Grotti*, 2008 Tex. Crim. App. LEXIS 761, at *22-23.

As we noted above, the evidence linking Hannah to Bradley's death is overwhelming: the unusual bank account activity; her knowledge of and access to insulin; her connection to Jones's death and the theft of her ring in Oregon; and the fact that she was the last person known to be with Bradley before the onset of the condition that led to her death. This evidence is far too substantial for us to be able to describe the verdict as clearly wrong and manifestly unjust. *See Watson*, 204 S.W.3d at 414-15.

Moreover, while it is true that there is some evidence in the record that conflicts with the jury's verdict, it is hardly enough to describe the guilty verdict as against the "great weight and preponderance of the evidence." To begin, we recognize that the cause of death in this case is indefinite because no autopsy was performed, but the logic of this point is limited. After all, no autopsy was performed because the revelations about the c-peptide test emerged only after the cremation had already been performed. At that point, while an autopsy would have been helpful, it was not necessary because multiple medical experts examined the c-peptide test results and agreed on the cause of death. The doctors were, in fact, so convinced that Bradley had died of an insulin overdose that they changed her death certificate to reflect this finding.

Hannah also sought to implicate Rhonda in Bradley's death. This explanation, however, is implausible given that we have a virtually minute-by-minute record of Rhonda's whereabouts on the day before Bradley's death. According to employment records,

22

Rhonda spent most of the day at work. Phone records show that she called and spoke to both Bradley and Hannah. Finally, for the one time of day that she did step away from work—between 3:23 and 4:30—she can provide a time-stamped receipt from J.C. Penney, proving that she had been shopping there. As the State emphasized, Rhonda's home is in northeast McAllen, but the J.C. Penney at which she was shopping is in the southern part of the city. It would have been exceedingly difficult—if possible at all—for Rhonda to leave work, go to the mall, go home to injure Bradley, and finally drive back to work, all within the span of less than an hour.

This contrary evidence is not substantial enough to overwhelm the evidence supporting the verdict. The evidence implicating Hannah was factually sufficient, and we overrule Hannah's third issue.

## VI. Conclusion

For the reasons outlined above, we believe that the trial court did not abuse its discretion by allowing the State to present evidence of Hannah's extraneous bad acts at Mission Hospital or in Oregon. Moreover, we believe that the evidence supporting her conviction is legally and factually sufficient. The judgment of the district court is therefore AFFIRMED.

GINA M. BENAVIDES
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Memorandum Opinion delivered and
filed this the 21st day of August, 2008.

23